UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

    v.

DAVID QUINONES

No. 23 CR 579

Judge Steven C. Seeger

## GOVERNMENT'S POSITION PAPER AS TO SENTENCING FACTORS

The UNITED STATES OF AMERICA, by its attorney, ANDREW S. BOUTROS, United States Attorney for the Northern District of Illinois, hereby submits its position paper as to sentencing factors. In consideration of the advisory Guideline range and statutory sentencing factors, the government recommends a within-Guideline sentence of 78 to 91 months of imprisonment.

## I. THE OFFENSE CONDUCT

### A. Overview of the Fraud Scheme and Financial Impact

Supplemental nutrition or "SNAP" benefits are available to qualified beneficiaries in Illinois and elsewhere for the benefit of low-income individuals and households. In Illinois, a beneficiary receives what is commonly called a LINK card, which resembles a credit card (also known as an electronic benefit transfer ("EBT") card). Each eligible person or household is assigned a unique LINK/EBT card and a PIN that a beneficiary enters into the store's electronic terminal to make a purchase.

SNAP benefits fraud has been a difficult problem in the Chicago area. Retailer A began investigating the fraudulent use of SNAP benefits in its stores after learning through local law enforcement officials ("LEOs") that individuals in the Chicago area

were using the benefits in illegal fencing (resale) operations. In June 2018, Retailer A reviewed its records and identified that defendant ranked #3 nationwide in the use of unique EBT cards at its stores. By the end of July 2019, defendant ranked #1 nationwide in his use of unique EBT cards at Retailer A.

Defendant also used EBT cards at a second retailer (Retailer B), opening multiple accounts in his own name to make the store purchases. In his Plea Agreement, defendant acknowledges that he caused the USDA to reimburse Retailer A and Retailer B for more than 5,000 fraudulent SNAP transactions. Through the investigation, LEOs identified that defendant purchased EBT cards from SNAP beneficiaries in cash to make bulk purchases of soda, water, and snacks. Defendant then sold the products he bought with the EBT cards to convenience stores and restaurants for his own profit.

Defendant's count of conviction, Count One, charges a fraudulent EBT transaction committed on November 14, 2018. On that date, LEOs conducting physical surveillance saw defendant drive to a Retailer A store and load his van with soda. Defendant purchased, among other items, approximately 20 cases of Pepsi with three unique EBT cards. Later that day, defendant drove to a different Retailer A location in Calumet City, Illinois. Defendant purchased, among other items, approximately 20 cases of Pepsi for $211.32, using three unique EBT cards. The charged wire transaction is highlighted in the chart below.

2

| EBT CARD (LAST 4 DIGITS) | AMOUNT | BENEFICIARY NAME |
|---|---|---|
| 9371 | $100.00 | C.S. |
| 3652 | $100.00 | L.M. |
| 3034 | $11.32 | R.M. |

After purchasing the items, defendant transported them to a gas station in Chicago to resell them for profit.

On February 4, 2020, LEOs introduced an undercover law enforcement officer (UC-1) to defendant to obtain information about his fraud scheme. Retailer A tipped LEOs that defendant just purchased 53 cases of Pepsi from its Evergreen Park location (the "Evergreen Park Store") using two EBT cards. UC-1 met defendant at the store and struck up a conversation. UC-1 told defendant that he had EBT cards for sale and offered to sell defendant a $350 card balance for $100. Defendant agreed to the transaction.

Inside the store, defendant told UC-1 to load Pepsi on a cart and meet at the cashier. At the check-out counter, Retailer A's surveillance video depicts that defendant gestured to UC-1 to swipe his EBT card and enter the PIN. Defendant then used UC-1's EBT card to buy approximately 29 cases of Pepsi for $303.92. LEOs maintained surveillance on defendant after he left the store and observed him unload the soda at a gas station.

On February 6, 2020, LEOs again established surveillance at the Evergreen Park Store. At approximately 7:00 p.m., defendant purchased 139 cases of soda using three EBT cards. UC-1, as a ruse, approached defendant and stated, "I'm doing the same thing today," meaning that UC-1 was selling EBT cards. UC-1 offered

defendant two cards with values of $316 and $320 for $300 cash. Defendant agreed to the transaction, using the SNAP benefit money to buy soda products.

On February 7, 2020, UC-1 and defendant met at the Evergreen Park Store. Defendant agreed to buy from UC-1 an EBT card with a value of $330 and used the funds to purchase soda. After making the purchase, defendant gave UC-1 $440 for the three EBT cards defendant used on February 6, 2020, and February 7, 2020.

Defendant committed over 5,000 fraudulent transactions mirroring these examples, charging $1,554,804.12 in fraudulent SNAP purchases.

**B.      Defendant Did Not Heed a Warning to Stop the Fraud**

On September 12, 2022, LEOs on surveillance observed defendant and another person drive to a Retailer B store and use various EBT cards to purchase cases of water. In the store's parking area, LEOs identified themselves as law enforcement officials and conducted an audio and video recorded interview of defendant. While speaking with LEOs, defendant acknowledged that he used EBT cards that did not belong to him but falsely suggested that he resold the drink products to individuals in personal use quantities. A LEO told defendant, "You know that's illegal, right?" Defendant responded, "No, I did not know that. If I have the pin number, if someone actually physically gives me the card, how is it illegal?"

During the same interview, defendant denied giving UC-1 money for EBT cards, which was a lie and reflects that defendant knew what he did was wrong. Defendant also was a SNAP beneficiary himself, and his benefit application documentation disclosed the prohibition against using someone else's EBT card for

personal gain, specifically warning defendant that he could be charged with a crime under federal law if he violated SNAP rules. During the interview, a LEO read aloud SNAP's written prohibitions and instructed defendant to stop using other beneficiaries' cards, reiterating, "This is a federal crime. I don't want you to take the fall for someone else [if defendant was working with someone else]." The LEO further stated, "This is a scam. You are not helping people. You are taking advantage of people because people on benefits do not have cash."

### C. Defendant's Continuation of the Fraud Scheme

After LEOs told defendant that his use of the EBT cards was illegal, he continued the offense conduct. Transaction records identify that defendant kept using the cards through 2022 and in July 2023. *See also* GVO, pp. 11-12.

On July 19, 2023, the end date of the charged fraud scheme, LEOs on surveillance saw defendant and Individual B travel to the Evergreen Park Store. At approximately 1:23 p.m., a person made an online purchase of soda products and water. An EBT card ending in 3155, registered to a woman in the state of South Carolina, was used to make the purchase. Retailer A's surveillance images show that defendant and Individual B exited the store with the items.

LEOs approached defendant and Individual B in the parking lot. Defendant told LEOs that he performed a delivery service for SNAP recipients, and that he stopped delivering products to stores and restaurants after his September 12, 2022, interview. When confronted with his June 8, 2023, EBT transactions and subsequent

delivery of goods to a Chicago restaurant (*see* GVO, pp. 11-12), defendant falsely stated that he paid for those items in cash.

### D.      Resources and Effort Necessary to Stop Defendant's Fraud

The investigation and prosecution of this case required significant law enforcement time and resources, together with substantial assistance from Retailer A.  The nature of defendant's fraud scheme, which involved the use of another person's EBT card, required that for each charged EBT transaction, the government establish that it was the defendant, not the real SNAP beneficiary, who made the purchase.

To investigate the offense, LEOs conducted physical surveillance to follow defendant's path to the retail stores, collect sales receipts, and determine where defendant appeared to resell the products.  Physical surveillance was paired with the review of voluminous transaction records and store surveillance video to identify: (a) the actual products defendant purchased for resale; (b) the beneficiaries of the EBT cards defendant used to buy the products; and (c) whether surveillance footage identified that defendant was the person who used the cards. Further, to better understand how the scheme worked, LEOs introduced an undercover officer, who spoke directly with defendant and witnessed fraudulent purchases.[1]

---

[1]      LEOs also formulated a plan to interview the top 10 recipients associated with defendant's use of EBT cards at Retailer A.  They attempted to locate and interview some of those individuals but were not successful in obtaining information about the investigation.

## II.     MAXIMUM PENALTIES AND GUIDELINE RANGE

Count 1 carries the following maximum penalties:

      a.     A maximum sentence of 20 years' imprisonment.  PSR, ¶ 115.

      b.     Maximum fine of $250,000, or twice the gross gain or gross loss resulting from that offense, whichever is greater.  PSR, ¶ 123.

      c.     A term of supervised release of not more than three years.  PSR, ¶ 118.

      d.     The Court must order restitution to the victims of the offense in an amount determined by the Court.  PSR, ¶ 22; 18 U.S.C. § 3663A.

      e.     $100 special assessment.  PSR, ¶ 124.

The government agrees with the advisory Guideline range calculated by the Probation Office.  PSR, ¶ 117.  More specifically, defendant has a total offense level of 26 and a criminal history category of III, producing an advisory range of 78 to 97 months of imprisonment.  *Id.*  The PSR identifies a second forgery conviction dated October 11, 2007, that was not described in the Plea Agreement (PSR, ¶ 55), which adds three points and places defendant in criminal history category III instead of II. PSR, ¶ 116.

Defendant has not yet filed a sentencing brief.  In pre-plea discussions, defendant opposed an enhancement under Guideline § 3B1.1(a) for being the organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive.  The enhancement applies.  PSR, ¶ 33.  Defendant acknowledges that his fraud scheme involved the use of more than 1,200 unique EBT

cards, a large number, and he at one time was the #1 abuser of EBT cards nationwide at Retailer A.  The PSR and GVO also describe that defendant recruited Individual B to help defendant on occasion to purchase, load, and distribute the products defendant bought with the EBT cards.  PSR, ¶ 33; GVO, pp. 3-4, 12 & Group Exh. C.[2] Whether the SNAP beneficiaries were drawn to defendant by word of mouth or his own active recruitment efforts, defendant clearly organized the activity through his repeated store visits, his resales of the products, and he reaped the greatest share of the proceeds through buying the card balances at a cash discount and keeping the profits from the resale of the goods.

III.   **SECTION § 3553(a) FACTORS**

    A.    **Circumstances of the Offense and Defendant's History and Characteristics.**

Defendant has a history of stealing money.  In March 2006, defendant cashed a forged check in a grocery store for $381.  PSR, ¶ 54.  The next day, defendant returned to cash a second check but was not successful.  During a law enforcement interview, defendant told LEOs that he purchased checks from another person, cashed them, and kept a share of the proceeds.  PSR, ¶ 54.

Defendant was convicted of forgery and sentenced to 5 years of imprisonment. PSR, ¶ 54.  The court, however, suspended the majority of defendant's sentence,

---

[2]     The PSR mentions that the case agent "reported that defendant would often receive calls and/or text messages from SNAP recipients, with whom the defendant would then meet to receive the card and PIN for a negotiated price."  PSR, ¶ 33.  The government clarifies that this is how LEOs believed defendant accomplished the scheme, as he had many individual cards, including a card from a person with an address in South Carolina.  LEOs did not seize any text messages or identify the persons who communicated with defendant by phone.

authorizing his participation in a work release electronic monitoring program. PSR, ¶ 54. After his second forgery conviction in October 2017, the court resentenced defendant to 1.5 years of imprisonment and an additional year of probation. PSR, ¶ 54.

The second forgery conviction arose from another check fraud scheme. On May 15, 2007, an associate of defendant attempted to cash bad checks totaling $1,400 at a casino, planning to split the proceeds with defendant. PSR, ¶ 55. During a search of defendant's car, LEOs seized an additional 14 payroll-type checks and two driver's licenses in other names. PSR, ¶ 55. The court sentenced defendant to 40 months imprisonment for this offense. PSR, ¶ 55.

The forged check cases were crimes of dishonesty, and defendant continued down this path on a much larger scale by committing the SNAP fraud offense. Defendant acknowledges undertaking 5,000 fraudulent SNAP transactions using over 1,200 individual EBT cards. Defendant built a large network of individuals willing to sell him benefits, and defendant was the sole leader and manager of the scheme.

Defendant committed the crime in a manner that was difficult, if not almost impossible, for law enforcement to detect without the proactive work of Retailer A. By making thousands of relatively small-dollar purchases on over 1,200 cards, defendant had to know it would be difficult and time-intensive for law enforcement officials to catch him in the act. His fraud was a needle in the haystack when juxtaposed against the purchasing activity of tens of millions of SNAP beneficiaries

9

nationally.[3] Further, defendant bought the items by using multiple accounts opened at Retailers A and B, including an account in the name of a third person (Individual A), which compounded the work required to identify defendant, the EBT cards he used, and his purchases.

Although the EBT card holders agreed to sell their benefits, defendant exploited their economic hardship, knowing that people enrolled in SNAP would be hard-pressed to turn down his cash offers. "Those who defraud SNAP are committing a serious crime that takes advantage of both taxpayers and families in need."[4] Cases like these also lead to distrust of public benefit programs, making it more challenging to generate public support to fund them.[5]

In addition, it is an aggravating factor at sentencing that defendant had the opportunity to stop the fraud but chose to continue the offense conduct. His September 12, 2022, interview should have been a wake-up call to change direction. LEOs told him that they were following him, had monitored his use of EBT cards, and that his conduct was illegal. Through hubris, greed, or some combination, defendant kept the scheme going, causing greater SNAP losses.

---

[3] For instance, in 2024, there were over 41.6 million SNAP participants in the United States, and 1.9 million participants in Illinois. https://www.cbpp.org/research/food-assistance/a-closer-look-at-who-benefits-from-snap-state-by-state-fact-sheets#Illinois (last visited September 18, 2025).

[4] https://www.fns.usda.gov/snap/fraud (last visited September 18, 2025).

[5] As the USDA described, "We are committed to respecting the generosity of American taxpayers by ensuring the programs operate with the utmost integrity." https://www.fns.usda.gov/snap/fraud (last visited September 18, 2025).

### B. Other Personal Characteristics and Remaining Factors

The Probation Office prepared a detailed PSR and sentencing recommendation describing defendant's history and characteristics. The PSR describes that defendant had a difficult childhood in certain respects and a gambling habit. He currently participates in mental health treatment, a positive step, but there is no indication that he sought help on pretrial release for a gambling addiction.

Defendant committed the instant offense in his 40s after sustaining 11 adult criminal convictions including the forgery cases. His 40-month sentence for the second forgery case did not deter him from reoffending; on the contrary, he orchestrated a much larger and more sophisticated SNAP benefits fraud scheme. Accordingly, in assessing the statutory factors, a within-Guideline sentence of 78 to 91 months would best promote respect for the law, provide just punishment, and serve as adequate deterrence. 18 U.S.C. § 3553(a)(2)(B).

## IV. RESTITUTION

The parties agree that the loss to the SNAP program was $1,554,804, and the government seeks reimbursement of this amount to the USDA. Absent defendant's theft, the program would have had more money available for program beneficiaries and its dollars would have stretched further.

## V. SUPERVISED RELEASE

The government agrees with a three-year term of supervised release with the conditions recommended by the Probation Office.

11

## CONCLUSION

Accordingly, the government requests that this Court impose a within-Guideline sentence of 78 to 97 months and a 3-year term of supervised release with conditions.

<div style="margin-left:40%">

Respectfully submitted,

ANDREW S. BOUTROS
United States Attorney

By: *s/ Erin Kelly*
   ERIN KELLY
   Assistant United States Attorneys
   219 South Dearborn Street
   Chicago, Illinois 60604
   (312) 886-9083
   erin.kelly@usdoj.gov

</div>