**IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | **No. 23 CR 579** |
| **v.** | ) | |
| | ) | **Judge Stephen C. Seeger** |
| **DAVID QUINONES** | ) | |

<u>**DAVID QUINONES' SENTENCING MEMORANDUM**</u>

David Quinones, by the Federal Defender Program and its attorney, Jack Corfman, submits this sentencing memorandum in support of a sentence of 41 months, the low-end of his lowered proposed guidelines range. Such a sentence properly holds Mr. Quinones accountable for his actions, without imposing a sentence greater than necessary.

I. Objections to the PSR.

Mr. Quinones has several objections or clarifications to factual assertions in the PSR, two objections to the guidelines calculations, for enhancements in PSR ¶¶ 30 and 32, and an objection to the restitution amount, PSR ¶ 114. He agrees, however, that his base offense level is 7, PSR ¶ 28, U.S.S.G. § 2B1.1(a)(1); that there is a 16-level enhancement for guidelines loss amount, PSR ¶ 29, U.S.S.G. § 2B1.1(b)(1)(I); and with the 3-level reduction for acceptance of responsibility, PSR ¶¶ 37–38, U.S.SG. § 3E1.1. He further agrees that he is criminal history category III.

a. Factual Objections.

Mr. Quinones has the following factual objections or corrections to the PSR:

¶ 21: Mr. Quinones objects to this description to extent it suggests that Mr. Welton was working for Mr. Quinones and at his direction, in furtherance of a criminal scheme. This will be discussed further in Mr. Quinones' guidelines objections, below.

¶ 59: Mr. Quinones objects, or more accurately provides an update, to this paragraph, as this case has now been dismissed and is no longer pending. *See* Exh. A.

¶¶ 62, 63, 67, 76: Mr. Quinones does not doubt that the PSR is accurately reporting information that is written down in police reports and other documents, but objects to the reliability and use of these narratives as unproven arrest narratives for cases that were dismissed. *United States v. Drain*, 740 F.3d 426 (7th Cir. 2014) ("a sentencing court may not rely on the prior arrest record itself in deciding on a sentence" although it may consider "a substantial history of arrests" for limited purpose when closely relevant).

¶ 67, 89: Mr. Quinones objects to the inclusion in the PSR of a gang affiliation, particularly when sourced from the Chicago Police Department's notoriously unreliable gang affiliation records. *See generally* Office of the Inspector General, City of Chicago, *Follow-Up Inquiry on the Chicago Police Department's "Gang Database,"* March 31, 2021, https://igchicago.org/wp-content/uploads/2023/08/OIG-Follow-Up-Inquiry-on-the-Chicago-Police-Departments-Gang-Database.pdf.

      b.   Mr. Quinones objects to PSR ¶ 30 because the EBT card and PIN are access devices, not authentication features.

Mr. Quinones objects to PSR ¶ 30, which applies a 2-level enhancement for use of an "authentication feature" during the offense, citing specific offense characteristic § 2B1.1(b)(1)(11)(A)(ii). "Authentication feature" is a term of art in the guidelines and federal statutes and does not apply to Mr. Quinones' conduct. The application notes

explain that "authentication feature" has the definition given to that same term in 18 U.S.C. § 1028(d)(1). U.S.S.G. § 2B1.1 cmt. n. 10(A). That provision, in turn, defines an authentication feature as:

> Any hologram, watermark, certification, symbol, code, image, sequence of numbers or letters, or other feature that either individually or in combination with another feature is used by the issuing authority on an identification document, document-making implement, or means of identification to determine if the document is counterfeit, altered, or otherwise falsified.

18 U.S.C. § 1028(d)(1). The statute further defines a "false authentication feature," in part, as a feature that was not authorized by the issuing authority to be affixed to a means of identification. 18 U.S.C. § 1028(d)(5)(B). As relevant here, the guidelines and statutes also define two further terms. A "means of identification" is "any name or number that may be used" to identify a specific person, 18 U.S.C. § 1028(d)(7). And an "access device" is one type of means of identification used to initiate financial transactions or payments—including "any card, plate, code, account number, electronic serial number, mobile identification number, [or] personal identification number," 18 U.S.C. § 1029(e). In other words, means of identification and access devices describe the information meant to be conveyed or used to fulfill a document's purpose, like personal identifiers or transaction information, while authentication features describe features supporting whether the document was properly issued by the issuing authority.

With this context in mind, Mr. Quinones' offense conduct did not include the use of an "authentication feature." The EBT card and PIN are access devices, and thus means of identification, rather than authentication features. The "sequence of numbers or letters" that would qualify a PIN to be an authentication

3

feature is the same sequence that makes it an access device, and is not used by the issuing authority to authenticate the EBT card. Moreover, reading every number that is a means of identification to also be an authentication feature in this manner would render large portions of the guideline superfluous and would be a puzzling result given the statutory structure.

The EBT and PIN are not used "by the issuing authority . . . to determine if the document is counterfeit, altered, or otherwise falsified." As far as counsel can tell, none of the USDA or SNAP records produced in discovery use a card's PIN number internally to track or authenticate its connection to their accounts or legitimacy of a particular card. Rather, the EBT and PIN are the core pieces that make "the document"—the card itself—function to initiate a transaction. Critically, a PIN is a personal number—it identifies the user. Under SNAP, for example, a household may have more than authorized user for benefits within the same household. And, separately from the SNAP program, authorized users of bank accounts sometimes receive cards with identical card numbers but different user names and PINs. Nor does a PIN say anything about the EBT card itself: a fake EBT card with a duplicate of a real EBT account and PIN might still work, while an expired card would be "authentic" even if the account number or PIN no longer functioned. So too could a card be authentic and valid even if one forgets their PIN or change their PIN entirely.

In order to understand the PIN as an "authentication feature," the government and probation ask this Court to believe that *any* identifying information connected to a means of identification also necessarily serves as an "authentication feature" if that information can be cross-checked. After all, a PIN

only "authenticates" the EBT card in the sense that a correct PIN allows a transaction to proceed properly. A person's date of birth is a means of identification under 18 U.S.C. § 1028(d)(7)(A), but the fact that a person has a real date of birth that could be checked against a database or birth certificate and verified does not mean that every date of birth is an authentication feature under the statute.

Treating an access device as an authentication feature merely because it also has some information that may be validated would render large portions of the guidelines enhancement superfluous. The guideline enhancement applies to the possession or use of any authentication feature. U.S.S.G. § 2B1.1(b)(11)(A)(ii). Access devices, however, only trigger this same enhancement when they are "unauthorized" or "counterfeit," *and* when they are being produced or trafficked, not simply possessed or used. U.S.S.G. § 2B1.1(b)(11)(B)(i). Means of identification only trigger the enhancement when they are improperly used in pursuit of obtaining additional improper means of identification. U.S.S.G. § 2B1.1(b)(11)(C). But if a means of identification is an authentication feature, nearly all the content of this enhancement just described is superfluous—every access device or means of identification would count as an authentication feature and therefore qualify under (b)(11)(A)(ii), simply by containing identifying information that could be verified. If so, there would be no need for such a complicated guideline structure delineating when the enhancement applies to authentication features, access devices, and means of identification.

Section § 1028 has a different structure that mostly avoids this superfluity, but it nonetheless clearly distinguishes between authentication features and

means of identification. The statute cites both authentication features and means of identification in the same sentence at least five times, in §§ 1028(a)(8), (b)(2)(A), (d)(1), (d)(6)(A), (h). And a rule of construction provides that multiple means of identification on one document are construed together to be a single means, while no such rule of construction exists for authentication features. 18 U.S.C. 1028(h). Further, the definition of a means of identification clearly explains that any access device is a means of identification, laying out that one is a subcategory of the other. By contrast, not only does the definition for authentication feature lack such a definition, it distinguishes them.

The Seventh Circuit does not appear to have addressed this circumstance in a published opinion. The only case counsel could find was in the unusual posture of the denial of an *Anders* motion to withdraw and an order for further briefing. In *United States v. Muhammad*, No. 20-3067, 2022 WL 738676 at *1 (7th Cir. March 11, 2022), the Court agreed that a social security number was plausibly not an authentication feature, without ultimately deciding that question, and ordered further briefing. Ultimately, however the Seventh Circuit did not have the opportunity to weigh in because the government[1] and the defendant jointly agreed to vacate the sentence and remand the matter back to the district court, jointly acknowledging that a social security number was not an authentication feature. *See* ECF Dkts. 35, 36, *United States v. Muhammed*, Seventh Circuit Case No. 20-3067. But if a social security number is not an authentication feature, it is hard to see how an EBT card or PIN number would

---

[1] The government was represented in that case by the U.S. Attorney's Office for the Western District of Wisconsin.

6

be: like a social security card, they contain a "means of identification" that can be checked against a database to see if it is accurate. But the existence of a real, or fake, social security number on a card is not a feature purporting to authenticate the social security card itself any more than a PIN authenticates the EBT card.

Mr. Quinones acknowledges that the Ninth Circuit has held that a SNAP PIN counts as an authentication feature in *United States v. Barrogo*, 59 F.4th 440 (9th Cir. 2023). There, the Ninth Circuit rejected the defendant's arguments that a PIN does not count as an authentication feature because it is not physically on the EBT card itself and, because the EBT cards were real and valid, that no falsification occurred when the defendant used an EBT card that was not hers. *Id.* at 445.

That court's reasoning, however, does not address Mr. Quinones' concerns. Other than a block quote of the definition of access device, *id.* at 444, the Ninth Circuit never acknowledged that a PIN was statutorily an access device, and so it did not address what, if any, relevance that might have. *Id.* at 447. The Ninth Circuit also did not acknowledge that there might be multiple users of a card or account, such that the PIN might distinguish between separate authorized users rather than authenticate a transaction.

More fundamentally, *Barrogo* candidly acknowledges that its holding means that any numerical sequence on a means of identification qualifies as an authentication feature: "Put another way, a sequence of numbers that is used by the issuing authority on a means of identification—such as a card that can be used to obtain anything of value—qualifies as an authentication feature." *Id.* at 445 (cleaned up). This consequence removes most of the guideline enhancement

7

provision and makes little sense under the statutory structure, and Mr. Quinones submits that this Court should not follow that case.

        c.  Mr. Quinones did not organize or lead any other participant in the scheme.

Mr. Quinones also objects to PSR ¶¶ 21 and 32, which discuss and apply the 4-level enhancement for being a leader or organizer of activity involving five or more participants or otherwise extensive. There is no dispute that Mr. Quinones' *own* actions were significant. But the aggravating role adjustment is not for individual actions; it is for someone who is the organizer, leader, manager, or supervisor of at least one other participant in a criminal scheme. U.S.S.G. § 3B1.1 cmt. nn. 2, 3. Here, Mr. Quinones engaged in many individual, arms-length commercial transactions with other SNAP recipients. Despite the PSR's suggestion, the fact that these transactions were not legal does not inherently trigger the enhancement or make Mr. Quinones an organizer or leader of a group. A buyer-seller relationship is not a conspiracy. And when Mr. Quinones engaged in transactions with other SNAP recipients, he did not organize, lead, manage, or supervise them; they entered a mutual deal to accomplish a criminal objective. At a minimum, the government has not proffered sufficient evidence to establish that Mr. Quinones had the necessary degree of control over another participant.

"The government must establish that the adjustment is warranted by a preponderance of the evidence." *United States v. Reneslacis*, 349 F.3d 412, 416 (7th Cir. 2003). "In the end, whether an enhancement is warranted (and what level) requires a practical inquiry, with the district court making a commonsense judgment about the defendant's relative culpability given his status in the criminal hierarchy." *United States*

*v. Colon*, 919 F.3d 510, 517 (7th Cir. 2019). The enhancement requires a concerted group activity, not a series of buyer-seller relationships. *See, e.g., United States v. McGee*, 985 F.3d 559, 563 (7th Cir. 2021) (rejecting application of § 3B1.1 enhancement to a middleman drug dealer where "there is no evidence indicating that [defendant] exercised any control or authority over" those to whom he distributed drugs); *United States v. Weaver*, 716 F.3d 439, 444 (7th Cir. 2013) (explaining that "[s]upplying drugs and negotiating the terms of their sale do not by themselves justify a Section 3B1.1 increase, for these things do not indicate that the person who does them has a greater degree of responsibility for putting together the drug operation or a particular deal than anyone else involved, including the customer"); *Reneslacis*, 349 F.3d at 417-18 (defendant who referred potential customers for immigration fraud scheme in exchange for bribes did not qualify for 3B1.1 enhancement because "his role was the same as a broker in a drug case who is compensated for referring an addict to a dealer").

Mr. Quinones was not in a supervisory position over others. Decisions were made jointly between Mr. Quinones and others individually—the fact that Mr. Quinones had his own knowledge about his part of a transaction does not make him a leader, any more than the fact that the other participants had access to other EBT cards make them leaders. And although Mr. Quinones appears to have made at least some additional money, that is to be expected given the scheme: the entire structure of the scheme was to purchase EBT cards for less than their value to make a return on the purchase price. But there does not appear to be a clear throughline to an enormously lucrative markup that Mr. Quinones withheld. For example, after one set of purchases with an undercover office, law enforcement follows him after he purchased about $450 worth of goods with benefits to a business, and the government's version notes that he had earlier received a

9

check from that business for about $400. He was, of course, in this for financial gain. But he did not manage or supervise any individual he purchased EBT benefits from.

Notably, the transactions that we have the most insight into arise from Mr. Quinones' interactions with the government's undercover officer. Those interactions do not suggest a unified, organized group action, or that Mr. Quinones was in a uniquely supervisory position—quite the opposite. The UC approached Mr. Quinones about selling food stamps, the UC set the price for doing so, and the UC repeatedly sought out Mr. Quinones. GVO at 6–9. Mr. Quinones did not follow up with the UC to push him to engage in traditional transactions, nor did Mr. Quinones introduce the UC to a conspiracy of individuals working in concert. *Id.* Even the PSR provides Special Agent Parrish's discussion of this arms' length negotiation process, which does not reflect some unique command by Mr. Quinones but instead meetings and negotiations. PSR ¶ 21.

The government and the PSR suggest that the actions of Mr. Welton support the finding that Mr. Quinones exercised some means of control or supervision. But the government has not provided clear evidence about Mr. Welton's role that would demonstrate a supervisory role for Mr. Quinones. Mr. Welton has denied being a participant in any wrongdoing when interviewed by law enforcement, and has never suggested that he took direction or instruction from Mr. Quinones in the criminal scheme. He even clarified that he knew Mr. Quinones socially and that they would often smoke together. To be sure, Mr. Welton may or may not have been entirely truthful. But Mr. Welton's knowledge or participation alone is not enough to trigger the leadership enhancement without more information—the aggravating role requires supervision of someone else who is criminally responsible. U.S.S.G. § 3B1.1 cmt. n. 1. Similarly, other

participants who engaged in transactions, some of whom were interviewed by law enforcement, did not describe Mr. Quinones as a supervisor or mastermind of a group scheme.

Thus, Mr. Quinones's situation is similar to the situation in *Reneslacis*: there, the defendant referred people seeking immigration papers to an undercover agent, who, for a bribe, would tender the papers and provide a kickback to the defendant. 349 F.3d at 414. The Seventh Circuit determined that the defendant was not a leader because the individuals he referred to the undercover agent were customers, not his subordinates. *Id.* at 417. Nor was the defendant an organizer, because there was no "common criminal objective"; instead, everyone involved "had their own agenda . . . making it impossible to say that [defendant] was organizing them for *concerted* action." *Id.* at 418 (emphasis in original). Applying the reasoning in *Reneslacis* leads to the same conclusion here: Mr. Quinones was neither a leader nor an organizer.

At the end of the day, Mr. Quinones is responsible for his own actions and his role in this food stamp fraud. He takes responsibility for that. But the government has not shown that he played an aggravating role in the scheme, as defined by the guidelines, because it has not shown that Mr. Quinones organized or led anyone else who was a criminal participant to it.

d. Summary

To sum up: under Mr. Quinones' proposed objections, his final offense level would be 20, with a criminal history category of III, for a guidelines range of 41 to 51 months. Under the PSR's proposed calculations, his final offense level would be 26, with a criminal history category of III, for a guidelines range of 78 to 97 months.

11

II.     The Government Has Not Suffered a Legally Cognizable Loss Under the
        Mandatory Victims Restitution Act.

Mr. Quinones objects to the restitution amount in PSR ¶ 114 of $1,554,804. He agrees and does not dispute that this is the total amount of government benefits paid out as a result of his scheme, and that this is the proper loss calculation for the guidelines. But the guidelines use a different formula from the MVRA to account for loss. Where, as here, the government almost certainly would have spent the SNAP benefits that Mr. Quinones obtained and used in the furtherance of his scheme regardless, the government has not suffered a cognizable loss under the MVRA.

   a.   SNAP program participants redeem well over 90% of their benefit
        allotment every month and have consistently done so for over twenty
        years.

Perhaps unsurprisingly, given SNAP's purpose in providing assistance to those who cannot afford to buy food, households redeem their SNAP benefits at an extraordinarily high rate each month. Recent USDA data on SNAP recipient spending in 2022—the most recent data available—shows that the average household redeems approximately three-quarters of their benefit within two weeks and nearly 95% of their total benefit by the end of the month. Castner et al., *Benefit Redemption Patterns in SNAP – FY 2022*, Food and Nutrition Service, U.S. Dep't of Agriculture (Dec. 1, 2025), https://www.fns.usda.gov/research/snap/benefit-redemption-patterns/2022. This is consistent with prior analyses dating back over twenty years, which show consistently high rates of benefits redemption by SNAP participants:

<u>Cumulative Proportion of Benefits Redeemed by Day of the Month</u>

<u>Year</u>      <u>Percentage of Benefits Redeemed</u>

| Year | Day 1 | Day 7 | Day 14 | Day 21 | End Month |
|------|-------|-------|--------|--------|-----------|
| 2017 | 16.5 | 56.7 | 77.6 | 89.1 | 95.9 |
| 2009 | 21.9 | 59.6 | 79.7 | 90.9 | 97.4 |
| 2003 | 20.4 | 59.5 | 79.8 | 90.8 | 97.3 |

Castner et al., *Benefit Redemption Patterns in the USDA SNAP: Fiscal Year 2017 (Summary)* at 1, Food and Nutrition Service, U.S. Dep't of Agriculture (Sept. 2020), https://fns-prod.azureedge.us/sites/default/files/resource-files/SNAPEBT-BenefitRedemption-Summary.pdf (full reports for fiscal years 2022, 2017, 2009, and 2003 are available at https://www.fns.usda.gov/research/snap/benefit-redemption-patterns). Moreover, even SNAP benefits that are not redeemed in a given month do not return to the government automatically but instead roll over to the next month. They can continue rolling over indefinitely as long as the recipient's account maintains a certain baseline activity level. While the practical impact of this intervention on the ground is no doubt important, and Mr. Quinones was a prolific actor in this arena, the high rate of SNAP redemption makes it exceedingly unlikely that Mr. Quinones caused the government to pay out over a million dollars that it would have fully retained otherwise.

      b. Because SNAP benefits utilization is so high, the government has not suffered a cognizable MVRA loss due to Mr. Quinones' actions.

Because the government almost certainly would have paid out the vast majority of these benefits even if Mr. Quinones had taken no action, he was not the but-for cause

13

of a government loss under the Mandatory Victims Restitution Act, and the award should be reduced.

Under the MVRA, the Court must order restitution to a victim with "a pecuniary loss." 18 U.S.C. § 3663A(c)(1)(B). A "victim" under the MVRA "means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered." *Id.* 3663A(a)(2). District courts "look at both cause-in-fact (but-for causation) and proximate cause." *United States v. Betts*, 99 F.4th 1048 (7th Cir. 2024). The defendants actions must have been a necessary factor in bringing about the victim's harm" to trigger a loss under the MVRA. *Id.* "The primary and overarching purpose of the MVRA is to make victims of crime whole, to fully compensate these victims for their losses and to restore these victims to their *original state of well-being*." *United States v. Robers*, 698 F.3d 937, 943 (7th Cir. 2012) (emphasis added). The government must normally establish restitution by a preponderance of the evidence. *United States v. Griffin*, 76 F.4th 724, 750 (7th Cir. 2023). Here, there is no factual dispute as to the benefits paid out by the government as a result of Mr. Quinones' actions. Instead, Mr. Quinones disputes whether his actions caused the government to pay out more than it would have done otherwise—in other words, whether his actions caused that loss, as the MVRA requires. *United States v. Burns*, 843 F.3d 679, 689 (7th Cir. 2016).

Unlike restitution, Mr. Quinones does not object to the guidelines loss amount because "the definition of loss for purposes of § 2B1.1(b)(1) is different from the definition of loss for restitution purposes." *United States v. Adcock*, 534 F.3d 635, 642 (7th Cir. 2008). Specifically, the commentary to the guidelines provides that the loss in benefits fraud cases "shall be considered to be not less than the value of the benefits

14

obtained by unintended recipients or diverted to unintended uses." U.S.S.G. § 2B1.1 cmt. n. 3(E)(ii). But no such provision appears in the MVRA.

The Seventh Circuit has not addressed this situation, but it has made clear that restitution is not available when there is no actual loss. For example, if real estate prices increase following a mortgage fraud scheme and a house is resold at a higher value, there is no MVRA loss. *Robers*, 698 F.3d at 944. Likewise, a restitution award for a fraudulently inflated government contract price is properly discounted by the amount the government would have otherwise spent on the contract. *United States v. Adcock*, 534 F.3d 635 (7th Cir. 2008) (affirming a restitution award to the government that discounted monies sent to a third-party hired, for less, to conduct the actual work the government paid for). And, in SNAP benefits cases in particular, two district courts have found that these kind of benefit schemes do not create an actual loss because the government would have paid out the benefits. As the district court in *United States v. Causey* explained in a similar case, "the SNAP recipients were entitled to the benefits that they illegally sold to defendant, and USDA-FNS would have spent [the total loss] even if Defendant had not conducted her fraud." 408 F.Supp.3d 1, 2 (D. Mass. Oct. 7, 2019); *see also United States v. Kadhem*, 580 F.Supp.3d 132, 139 (W.D. Penn. Jan. 14, 2022) (agreeing with the reasoning from *Causey* and imposing no MVRA loss in a food stamps fraud).

Mr. Quinones' actions no doubt damaged the integrity of the SNAP program, and it is right that he was prosecuted. But he did not proximately cause loss to the government through his actions—even if Mr. Quinones had never engaged in this scheme, the redemption rate of SNAP benefits is overwhelming and it is likely that the government would have paid out nearly the exact same amount of money anyway. As a

result, Mr. Quinones requests that the Court find that there was no loss, as the Courts in *Causey* and *Kadhem* did in similar cases.

III. The Sentencing Guidelines Overstate the Seriousness of Mr. Quinones' Offense, § 3553(a)(1), (a)(2)(A).

a. The loss calculation does not capture the benefit to Mr. Quinones or the actual loss to the government.

Mr. Quinones does not challenge the calculation of his loss amount, which properly accounts for government SNAP benefits Mr. Quinones caused to be paid out improperly over a number of years. At the same time, the loss amount here is highly unusual. First, Mr. Quinones purchased the SNAP benefits, and so he did not personally receive this full loss amount as individual profit. Transactions with the UC, for example, often resulted in payments in the realm of 50 cents on the dollar. But these were often offered up front by the UC, and in one interview Mr. Quinones told law enforcement that he would usually pay closer to 75 cents on the dollar. GVO at 17. That is not to take away from the absolute value of benefits paid out improperly, but the amount that made its way back to Mr. Quinones is almost certainly less.

Second, this counterfactual world means the guidelines loss amount is somewhat off the mark when the court considers the § 3553(a) factors in weighing sentence. As Mr. Quinones discussed in more detail, above, SNAP benefits are redeemed at extremely high rates. It is thus very unlikely that the government, but for Mr. Quinones' actions, would have at its disposal $1 million or more to spend elsewhere. That money perhaps would have been better spent in that world, but it still would have been spent, and so the government's pecuniary loss would be the same.

This is not to say that the law, or the rules surrounding benefits, are not important or should not be followed. It is still a crime, which Mr. Quinones has pled

16

guilty to and understands he will be punished for. And there is no doubt about the severity of his conduct, which lasted for many years and persisted even after law enforcement told him to cease. Still, the loss amount in this case creates a 16-level increase in his guidelines, a sizable majority of his total offense level. That number is simply not an accurate reflection of either his net gain or the government's relative position today if he had not undertaken these actions.

      b. Mr. Quinones' actions are rightly criminalized, but featured an unusual lack of direct harm to others beyond the integrity of the SNAP program.

In the same vein, Mr. Quinone's benefits frauds scheme was a violation of SNAP program rules, but largely was not a scheme to cheat individuals other than the government. To be sure, his conduct undermined the integrity of the food stamps program, a critical American benefits program. But he did not create fake benefits recipients, or deal particularly unfairly with either EBT cardholders or those he resold goods too. The EBT benefits cards were real, and so the stores Mr. Quinones made purchases from could properly go and obtain reimbursement for their costs. Mr. Quinones really did make sales and deliveries, and there is no evidence in the discovery that he defrauded or cheated those stores he resold goods to in other ways.

Even for the benefit recipients themselves who sold their benefits to him in exchange for cash, there is no evidence to suggest those interactions were coercive or threatening. Of course, that doesn't make these interactions legal, but neither were they harmfully coercive: he was one party to a willing, two-party transaction. It is a travesty of our American government and social fabric that a SNAP recipient might, for any reason, be in a position where they are willing to sell their SNAP benefits to another for cash at a discount. But Mr. Quinones did not create the conditions and demands of

17

American poverty. Even the government knows this—the UC often played up his financial need to make money now, or get some bill or debt resolved quickly, to engage with Mr. Quinones during the investigation. Of course, food stamps are protected for a reason. But it does make his case unusual among the types of cases that come before the court, as Mr. Quinones' conduct and the loss amount just track a little less cleanly into the kind of harm that we normally expect to see from a federal criminal prosecution.

IV. Mr. Quinones's History and Personal Characteristics Demonstrate His Story of Adversity, Providing Context for His Conduct, 18 U.S.C. § 3553(a)(1).

As reflected and laid out in much more detail in the PSR ¶¶ 77–104, and in the expert evaluation, Exh. B, Mr. Quinones had a traumatic childhood that has never provided success to him. His father tied him up with extension cords, strike him, and burn him. PSR ¶ 79. And even when he was not actively hurting a young Mr. Quinones, his father would lock him away in a closet for hours at a time. *Id.* Thankfully, his mother took him away from his father when she learned of the abuse, and he was raised in a relatively more stable home afterwards. Still, because of the neighborhoods he was raised in, he was surrounded by other traumatic exposure to gangs and violence, causing his family to move away. PSR ¶ 82. Following this, he successfully graduated from high school, PSR ¶ 105, and over his life has worked a number of jobs, including forklift driving, mechanic, and carpenter. PSR ¶ 107.

But moving as a child did not resolve every aspect of his life. He has been shot twice, PSR ¶¶ 91–92, and suffers from significant mental health issues both as a result and apart from those occurrences. PSR ¶¶ 95–96. He suffers from an troubling gambling addiction, which he told probation that he thought he lost as much as

18

$500,000 due to this addiction. PSR ¶ 24. And, as a younger man, he was previously convicted of forgery in Indiana. PSR ¶¶ 55.

Still, upon release he has made some strides to move forward. He is the primary caretaker for both his mother and his daughter. PSR ¶¶ 84–85. His mother's mental illness causes her to struggle to accomplish basic tasks, which Mr. Quinones must do instead. PSR ¶ 84. And his daughter tragically suffers from a serious complication from a childhood injury, and likewise needs extensive support. PSR ¶ 85. This case is his first criminal conviction since his release from Indiana custody in 2010, and even his arrests during this period are near-uniformly for minor conduct. Taken together, this history provides some context for Mr. Quinones' struggles to maintain a cleanly positive trajectory. They are not, of course, excuses for recent criminal actions. But they show a person who is working to make strides and is on the path forward. Crucially, and unlike his last term of incarceration, they also show a person who is capable of positive and fulfilling relationships and who has the family connections to motivate him to avoid criminal activity going forward upon release.

V. Deterrence is Achieved Here, 18 U.S.C. § 3553(2)(B)–(C).

Of course, the Court is not only concerned with the past, but also the future. The sentence must work to deter both Mr. Quinones and others. A 41-month sentence will do so.

Perhaps most importantly, Mr. Quinones has been on pretrial release in this case for the last two years. He has done fairly well, and his only reported violation was for the state case that has since been dismissed. He also had two positive tests for marijuana, PSR ¶ 104, but since that time has repeatedly tested negative. Given that he was a longtime, daily user before this case, PSR ¶ 101, the fact of a relapse, recovery, and the

19

ability to push forward is a positive sign for his future. He has maintained important, supportive relationships for his mother and daughter. And he expressed self-awareness about his own mental health needs and the need to continue improving himself during his PSR interview, as well as an openness to treatment for his pervasive and longstanding gambling addiction, all encouraging further evidence that he is working to push his life in a positive direction. PSR ¶¶ 95–96. Of course, he still has room to grow—notably, his employment remains less stable than the ideal. Still, his ability to maintain his pretrial release status without incident while improving on other facets of his life demonstrates that he is already taking steps in the right direction, and that a sentence imposed at this juncture does not need to hammer home to Mr. Quinones that he needs to change his ways.

At the same time, a sentence of 41 months will underscore the severity of Mr. Quinones actions and their consequences. Although he previously served a sentence that was listed as 40 months, PSR ¶ 55, Indiana has significant sentencing credits. In. Code § 35-50-6-4. Mr. Quinones only serve about half of that time for that case, and served additional time for a probation violation filed at the same time. A 41-month sentence in this case will be by far the most significant sentence he will have had to serve a term for, appropriately accounting for his prior experience while not being any harsher than necessary.

More personally, Mr. Quinones understands the error he has made. As explained above, he has already made efforts to improve himself. And one of the clear drivers of his actions—his gambling addiction—is not something that is addressed by the length of a term of incarceration. If anything, it is at risk of being exacerbated. The BOP has a well-documented drug treatment program, RDAP, but no related gambling program,

20

and gambling is extremely widespread in prisons. *See, e.g.*, Tordal et al., *The prevalence of gambling problems in prison populations: A systematic review and meta-analysis*, 13 J. of Behavior Addictions 1, 25–35 (2024), https://pmc.ncbi.nlm.nih.gov/articles/PMC10988396/ (explaining that a meta-review found that nearly 30% of individuals in the prison population suffer from a gambling problem).

A sentence of 41 months' imprisonment will demonstrates to the community that not respecting the law is the sure way to lose one's freedom for a significant period of time. There is little evidence to support the notion that a greater sentence is that empirically valuable. The certainty of being caught, rather than the severity of the punishment imposed, is a "vastly more effective deterrent." Office of Justice Programs, National Institute of Justice, *Five Things About Deterrence*, June 5, 2016, https://nij.gov/five-things/pages/deterrence/aspx. Empirical research likewise shows no clear relationship between sentence length and deterrence. Raymond Paternoster, *How Much Do We Really Know About Criminal Deterrence?* 100 J. Crim. L. & Criminology 765, 817 (2010) ("[I]n virtually every deterrence study to date, the perceived certainty of punishment was more important than the perceived severity."). The general research finding is that "deterrence works" at a high level of generality, but not at the granular decision point of between, say, 2.5 and 5 years' imprisonment. *See* National Research Council, *The Growth of Incarceration in the United States: Exploring Causes and Consequences*, Committee of Causes and Consequences of High Rates of Incarceration, at 345, J. Travis, B. Western, and S. Redburn, Editors (2014) ("the decision to commit a crime is more likely influenced by the certainty and swiftness of punishment than by the severity of the criminal sanction"). This prosecution itself has

the greatest deterrent effect. It sends a strong message to others in the community: if you break the law, you will be caught, you will be punished with imprisonment, and you will be monitored by the Court for years after your release.

\* \* \*

For the reasons stated above, as well as those that will be presented at the sentencing hearing, Mr. Quinones respectfully requests that this Court impose a sentence of 41 months. Such a sentence best fulfills the purposes of sentencing in the circumstances of Mr. Quinones's case, accounting for his offense conduct and his personal circumstances, without punishing him more harshly than necessary.

Respectfully submitted,

FEDERAL DEFENDER PROGRAM
John F. Murphy,
Executive Director

By:     /s/ *Jack Corfman*
        Jack Corfman
        Attorney for David Quinones

        Federal Defender Program
        55 E. Monroe Street, Ste. 2800
        Chicago, IL  60603
        (312) 621-8342

22